UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Edwin F. Read,

      Plaintiff,

      v.                             Civil Action No. 2:13-cv-86

Commissioner of Social Security,

      Defendant.

## OPINION AND ORDER
(Docs. 11, 15)

Plaintiff Edwin F. Read brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits.  Pending before the Court are Read's motion to reverse the Commissioner's decision (Doc. 11), and the Commissioner's motion to affirm the same (Doc. 15).  For the reasons stated below, the Court DENIES Read's motion, and GRANTS the Commissioner's motion.

## Background

Read was 38 years old on his alleged disability onset date of October 15, 2008. He is a high school graduate, and has received vocational training as an automobile mechanic.  His work history includes working as a tire and oil changer, a laborer, a truck driver, an automobile reconditioner, a furniture factory line attendant, a vinyl-siding

laborer, a school bus driver, a fast-food worker, and a products assembler.  He last worked in October 2008, when he reinjured his shoulder, requiring surgery.  He initially injured his shoulder in 2002, when he fell off a ladder.

Read lives with his wife and has three adult children.  He is obese, and spends most of his days sitting at home watching television and doing simple household chores and repairs.  (AR 60–61, 236–38, 255–56, 465–66.)  In November 2007, Read's treating primary care provider noted that Read had gained approximately 150 pounds in the prior year and had a history of arthritis, gout, back problems, morning stiffness, and chronic pain in his shoulders.  (AR 397.)  The provider assessed Read with hypertension and morbid obesity.  (*Id.*)  Read also suffers from back and neck pain, sleep apnea, memory problems, and depression.  He testified at the administrative hearing that his biggest impairments are his back and arm/shoulder pain, which make it difficult for him to bend, reach overhead, and sit or stand comfortably for more than approximately 30 minutes.  (AR 52–58.)

In February 2010, Read filed applications for social security income and disability insurance benefits.  In his disability application, he alleged that, starting on October 15, 2008, he has been unable to work due to left shoulder pain, chronic back pain, arthritis, gout, high blood pressure, memory problems, learning problems, sleep apnea, and depression.  (AR 218–19.)  Read's application was denied initially and upon reconsideration, and he timely requested an administrative hearing.  The hearing was conducted on July 14, 2011 by Administrative Law Judge ("ALJ") Debra Boudreau.  (AR 40–76.)  Read appeared and testified, and was represented by an attorney.  A vocational

expert ("VE") also testified at the hearing.  On October 24, 2011, the ALJ issued a decision finding that Read was not disabled under the Social Security Act at any time from his alleged onset date through the date of the decision.  (AR 21–33.)  Thereafter, the Appeals Council denied Read's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–4.)  Having exhausted his administrative remedies, Read filed the Complaint in this action on May 20, 2013.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1),

416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Boudreau first determined that Read had not engaged in substantial gainful activity since his alleged onset date of October 15, 2008.  (AR 24.)  At step two, the ALJ found that Read had the following severe impairments: left shoulder arthritis, obesity, degenerative disc disease, and an organic mental disorder with an affective disorder.  (*Id.*)  Conversely, the ALJ found that Read's obstructive sleep apnea, fecal incontinence, gallstones, and gout were non-severe. (AR 24–25.)  At step three, the ALJ found that none of Read's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 25–26.)

Next, the ALJ determined that Read had the RFC to perform light work, as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Read] is unable to climb ladders or scaffolds, but can frequently climb
> stairs and/or ramps as well as frequently balance, stoop, kneel, crouch[,] or
> crawl.  He can occasionally reach overhead with the non-dominant left

upper extremity and has no other manipulative limitations.  [He] is able to understand and remember one[-]to[-]three[-]step instructions and is able to persist at these instructions for two-hour blocks of time over a typical workday and work week in a low[-]stress setting (defined as limited to one[-]to[-]three[-]step instructions).  He is able to interact appropriately with the public, co[]workers, and supervisors.  He is able to manage changes typical in routine work and is able to plan and set goals.

(AR 27.)  Given this RFC and the VE's testimony, the ALJ found that Read was capable of performing his past relevant work as a fast-food worker and an auto detailer.  (AR 32.)  Alternatively, and again considering the VE's testimony, the ALJ determined that there are other jobs existing in significant numbers in the national economy that Read could perform, including courier, hotel housekeeper, cashier II, office helper, and office mail clerk.  (AR 32–33.)  The ALJ concluded that Read had not been under a disability from the alleged onset date of October 15, 2008 through the date of the decision.  (AR 33.)

### Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

## I.    Severity of Obstructive Sleep Apnea

Read first argues that the ALJ should have found his obstructive sleep apnea severe at step two.  For an impairment or combination of impairments to be deemed "severe," it must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c); *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010).  Thus, an impairment is not "severe" when the medical evidence

establishes only a "slight abnormality" or a combination of slight abnormalities which would have no more than a "minimal effect" on the claimant's ability to work.  SSR 85-28, 1985 WL 56856, at *3 (1985).  Additionally, to be "severe," an impairment or combination of impairments must last, or be expected to last, for a continuous period of at least twelve months.  20 C.F.R. § 404.1509.

The ALJ found that Read's obstructive sleep apnea was not severe because "it was well treated with CPAP[1] 11 cm/H2O."  (AR 24 (citing AR 546).)  Substantial evidence supports this finding.  Although a June 2010 treatment note states that a sleep study was to be scheduled after sleep apnea was observed in the hospital (AR 505), and a September 2010 treatment note documents "[v]ery severe obstructive sleep apnea" (AR 549); a November 2010 treatment note states that Read's sleep apnea was "well treated with CPAP 11 cm/H2O" (AR 545).  A January 2011 follow-up note indicates that, although Read was having excessive daytime sleepiness, he was "doing exceedingly well in terms of reducing his AHI[2]."  (AR 586.)  Finally, treatment notes from August 2011 state that Read was "doing very well" with using the CPAP machine and medication to treat his sleep apnea (AR 606), resulting in "very good symptom reduction" (AR 607).

Read argues that the ALJ improperly "ignored" a December 2010 treatment note which found that Read experienced only modest symptom reduction regarding his sleep

---

[1]  CPAP is an acronym for continuous positive airway pressure.  A CPAP machine is "a common treatment used to manage sleep-related breathing disorders including obstructive sleep apnea . . . ." *Crofoot v. Comm'r of Soc. Sec.*, No. 1:12–cv–521 (GLS/ESH), 2013 WL 5493550, at *7 n.24 (N.D.N.Y. Sept. 30, 2013).

[2]  AHI is an acronym for Apnea-Hypopnea Index, which refers to the number of episodes of reduced or absent respiratory effort per hour.  *Ladner v. Astrue*, No. 2:09–cv–00253–PMP–LRL, 2010 WL 3118589, at *2 n.3 (D. Nev. June 30, 2010).

apnea.  (Doc. 11 at 16 (citing AR 556–57).)  But that note was followed by the treatment notes described above, which document significant improvement in January and August 2011.  (AR 586, 606–07.)  Moreover, the December 2010 note does not document severe symptoms, stating as follows:

> [Read] is tolerating the CPAP very well. . . .  [He] goes to bed at 8:00-9:00 p.m. and can fall asleep within 20 minutes or so.  He gets up at 5:00 a.m. with his wife's alarm.  Infrequently, [he] may wake up spontaneously at 3:30-4:00 a.m. and cannot get back to sleep.  Generally, this is not a problem.

(AR 556.)  Read has failed to demonstrate that his obstructive sleep apnea caused disabling limitations for at least a twelve-month period.

## II.    ALJ's Consideration of Read's Obesity

Read next asserts that the ALJ did not comply with the procedures set forth in Social Security Rulings ("SSRs") 02-1p and 96-8p in evaluating Read's obesity.  (Doc. 11 at 17–18.)  SSR 02-1p discusses how ALJs should evaluate obesity claims, and provides as follows: "The combined effects of obesity with other impairments may be greater than might be expected without obesity. . . .  As with any other impairment, [the Commissioner] will explain how [he or she] reached [his or her] conclusions on whether obesity caused any physical or mental limitations."  SSR 02-1p, 2000 WL 628049, at *6, 7 (Sept. 12, 2002).  The Sixth Circuit observed that SSR 02-1p does not mandate a particular mode of analysis in obesity cases: "It is a mischaracterization to suggest that [SSR 02-01p] offers any particular procedural mode of analysis for obese disability claimants."  *Bledsoe v. Barnhart*, 165 F. App'x 408, 411–12 (6th Cir. 2006).  And the Third Circuit explained that the standard for evaluating a claimant's obesity under SSR

02-1p is simple: "[A]n ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009).

Here, the ALJ explicitly cited and discussed SSR 02-1p, and then applied the ruling to Read, finding as follows: "morbid obesity has been suggested by [Read's] treating sources as affecting [his] overall condition; however, he remains fully weight bearing and does not have abnormal neurological functioning. Therefore, . . . [Read's] combination of impairments, including obesity, does not meet or equal the severity of an impairment." (AR 25.) In his Motion, Read vaguely argues that "someone with obesity, as well as shoulder arthritis and degenerative disc disease, *may* have more pain and limitation than might be expected from shoulder arthritis and degenerative disc disease alone" (Doc. 11 at 18 (emphasis added)); and in his Reply, Read notes that his weight was stated to be over 500 pounds "at one point," 416 pounds in "about 2009," and 355 pounds in December 2011 (Doc. 16 at 3 (citing AR 622, 638, 641)). Read fails to state, however, any particular limitation(s) on his ability to work that allegedly was caused by his obesity alone or in combination with other impairments. Accordingly, the Court finds no error in the ALJ's consideration of Read's obesity. *See Britt v. Astrue*, 486 F. App'x 161, 163 (2d Cir. 2012) (finding no error in ALJ's evaluation of claimant's obesity where claimant failed to furnish ALJ with any medical evidence showing how his obesity limited his ability to work).

III.    ALJ's Analysis of the Medical Opinions

Next, Read contends the ALJ erred in giving "great weight" to the opinions of non-examining agency physicians Drs. Ward Stackpole, William Farrell, and Ellen Atkins; "some weight" to the opinions of examining agency physical therapist ("PT") Ted Lamb; and "moderate weight" to the opinions of examining psychologist Dr. Gregory Korgeski.  (Doc. 11 at 18–23.)  Read claims the ALJ should have given more weight to the opinions of PT Lamb and Dr. Korgeski because they examined Read, while Drs. Stackpole, Farrell, and Atkins did not.  (Doc. 16 at 2.)  Read also claims the ALJ should have assessed the opinions of non-examining agency consultant Dr. Geoffrey Knisely, and should have further developed the record regarding the medical opinions.

A.    Examining Agency Consultant PT Lamb

The ALJ afforded "moderate" or "some" weight to the opinions of examining agency consultant PT Lamb.  (AR 31.)  Lamb examined Read in May 2010, and noted that Read had decreased active range of motion in the shoulder, back, and knee; and weak grip strength.  (*Id.*)  Lamb further found that Read had the following functional limitations: difficulty bending, lifting, and twisting; difficulty lifting from floor to waist or waist to overhead; inability to perform overhead activities without shoulder pain; and difficulty sitting or standing for prolonged periods.[3]  (AR 469–70.)

Given the subjective language used in Lamb's assessment (e.g., stating that Read had "difficulty" performing certain motions, rather than that he was unable to perform

---

[3]  Interestingly, although Lamb found that Read's physical impairments limited his ability to function, he recorded that Read "denie[d] any functional limitations."  (AR 469.)

them or could perform them for only a certain amount of time) (AR 470), the limitations he assigned to Read could reasonably be accounted for in the ALJ's RFC determination (e.g., stating that Read is able to do only "light" work, is unable to climb ladders or scaffolds, and can only occasionally reach overhead with the non-dominant left upper extremity) (AR 27).  Moreover, the ALJ gave proper reasons for his allocation of only moderate weight to Lamb's opinions, stating that they were: (a) "not entirely consistent with the evidence of record"; (b) not supported; and (c) less reliable based on Lamb's status as a physical therapist and not an acceptable medical source.  (AR 31.)

"Acceptable medical sources" are defined in the regulations to include licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists, 20 C.F.R. § 404.1513(a), whereas sources such as nurse practitioners, chiropractors, and therapists are defined as "other sources," 20 C.F.R. § 404.1513(d)(1).  ALJs are not required to evaluate the opinions of "other sources" in the same manner as required under the treating physician rule, and thus it was proper for the ALJ to consider that Lamb "is not an acceptable medical source" (AR 31).  *See* 20 C.F.R. § 404.1527(d)(2); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Further, the ALJ specifically explained how Lamb's opinions were unsupported, stating as follows: "There is no support in [Lamb's] narrative for the opinion that [Read] could not sustain prolonged positioning.  Muscle and motor strength testing ranged from 4+/5 to 5-/5.  He did not assess how much weigh[t] [Read] could lift on a regular basis or how much overhead reaching [he] could do before the pain became unbearable."  (AR 31.)  Finally, substantial evidence supports the ALJ's finding that Lamb's opinions are

not entirely consistent with other evidence in the record.  For example, objective findings showed a normal gait and normal strength and reflexes in the upper and lower extremities.  (AR 555, 643, 656.)

Read asserts that, because Lamb was retained by the agency and the ALJ found his opinions unsupported, the ALJ should have further developed the record or obtained another consultative examination.  (Doc. 11 at 19.)  The Second Circuit has held, however, that: "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (internal quotation marks omitted).  Here, there are no obvious gaps in the record, and the ALJ satisfied her duty to obtain a complete medical history.  Thus, the ALJ was not required to further develop the record.

### B.     Non-Examining Agency Consultants Drs. Stackpole and Knisely

Read also finds fault with the ALJ's decision to afford "great weight" to the opinions of non-examining agency consultant Dr. Stackpole.  (AR 31.)  In June 2010, Dr. Stackpole opined that, despite his impairments, Read could perform light work, but could only occasionally climb ladders, ropes, or scaffolds and reach overhead.  (AR 491–98.)  Approximately one month later, non-examining agency consultant Dr. Knisely also opined that Read could perform light work, but differed from Dr. Stackpole in opining that Read could never climb ladders, ropes, or scaffolds; and was limited in his ability to push/pull with his upper extremities.  (AR 511–18.)  The ALJ did not mention Dr. Knisely's opinion, and Read claims the error requires remand.  The argument fails,

12

however, because, other than the push/pull restriction identified by Dr. Knisely, the

ALJ's RFC determination includes the restrictions included in Dr. Knisely's assessment.

(*Compare* AR 27 *with* AR 511–18.)  The ALJ's failure to include the push/pull restriction

is harmless, as there is no evidence that this restriction would significantly erode the light

occupational base and thus would have affected the disability determination.  *See* SSR

96-9P, 1996 WL 374185, at *6 (July 2, 1996) ("Limitations or restrictions on the ability

to push or pull will generally have little effect on the unskilled sedentary occupational

base."); *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986) (a nonexertional impairment

"significantly diminish[es]" a claimant's range of work when it causes "the additional

loss of work capacity beyond a negligible one or, in other words, one that so narrows a

claimant's possible range of work as to deprive him of a meaningful employment

opportunity").

    Read asserts that the opinions of Drs. Stackpole and Knisely "cannot constitute

substantial evidence to uphold an ALJ's decision" because they were based on an

incomplete medical record.  (Doc. 11 at 21.)  Generally, in cases where it is unclear

whether the consulting agency physicians reviewed all of the claimant's relevant medical

information, these opinions will not override those of the treating physicians.  *Tarsia v.

Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011).  But where, as here, the consultant opinions

are supported by the record and there is no evidence of a new diagnosis or a worsening of

the claimant's condition after the consultant opinions were made, the ALJ may rely on

them.  *Charbonneau v. Astrue*, No. 2:11–CV–9, 2012 WL 287561, at *7 (D. Vt. Jan. 31,

2012).  The ALJ in this case acknowledged that "additional evidence was received after

Dr. Stackpole provided his opinion," but found that this evidence "did not present any material differences in [Read's] condition and Dr. Stackpole's opinion remains consistent with the record in its totality." (AR 31.) The record supports this finding, and does not demonstrate a sustained deterioration in Read's condition after Drs. Stackpole and Knisely made their opinions.

In an attempt to demonstrate that his condition worsened after Drs. Stackpole and Knisely made their opinions, Read cites medical records documenting his sleep apnea, fecal leakage, and back pain. (Doc. 11 at 21.) As discussed above, however, the record supports the ALJ's finding that Read's sleep apnea was not severe. Regarding Read's fecal leakage, the record does not demonstrate that the condition affected Read's ability to work. (*See, e.g.*, AR 553 ("leaks stool in bed at times"), 589 ("leakage of small amounts of loose stools several times per month").) In any event, the record reflects that the condition was resolved within approximately six months of Read reporting it to a medical provider. (*See* AR 553, 638 ("[t]he los[s] of bowel control he had earlier in the year has cleared with him working with a gastroenterologist").)

Finally, Read cites to medical records documenting his back condition, including an August 2010 MRI, a December 2010 treatment note indicating a diagnosis of degeneration of lumbar or lumbosacral intervertebral disc and degeneration of cervical intervertebral disc, and a January 2011 bone scan. (Doc. 11 at 21 (citing AR 542, 553, 558).) These records do not establish any permanent or prolonged deterioration of Read's back impairment. In fact, the December 2010 treatment note states that Read "ha[d] a history of [lower back] and neck pain over the past 1–2 years," which would

14

include the period when Drs. Stackpole and Knisely made their opinions (June and July 2010), and does not indicate that the pain had worsened in that time.  (AR 553.)  A treatment note from approximately five months later states that Read's lower back pain still had not changed, even despite Read's loss of over 100 pounds.  (AR 638.) Furthermore, although Drs. Stackpole and Knisely were unable to review the records cited above, Dr. Knisely reviewed and noted a May 2010 x-ray which revealed problems with Read's lumbar spine (AR 508), but still found that Read "should be able to do light work" (AR 513).

### C.    Examining Agency Consultant Dr. Korgeski

Read also contends the ALJ erred in her analysis of the opinions of examining agency consultant Dr. Gregory Korgeski.  After interviewing and examining Read, Dr. Korgeski prepared a Psychological Evaluation in which he opined as follows: "It is possible that [Read's] memory would interfere with functioning in simple tasks, though I also would estimate that a bigger difficulty would be the likelihood that the combination of his [mental problems] would result in his being singled out as a poorer than average worker."  (AR 467.)  Dr. Korgeski continued: "Of course, if [Read] were able to get a more stable life situation, . . . adequate medical treatment for his conditions, and some supportive help in coping, possibly along with some medical treatment for his depression, his situation would likely improve."  (*Id.*)  The ALJ afforded only "moderate weight" to these opinions because, although they are "generally consistent with the evidence of record," Dr. Korgeski "did not provide an opinion regarding [Read's] functional abilities and limitations."  (AR 31.)

The ALJ's assessment of Dr. Korgeski's opinions was proper.  The ALJ correctly stated that Dr. Korgeski did not provide an opinion on Read's functional limitations. Instead, Dr. Korgeski equivocally stated that it was "possible" Read's memory issues would interfere with work functions, and that he would "estimate" there being a "likelihood" that Read would be a "poorer than average worker."  (AR 467.)  Moreover, Dr. Korgeski appears to have based his opinions largely on the perception that Read was not receiving treatment for his physical impairments, stating: "I suspect [Read's] current functioning is about the best he can do given no treatment for several painful conditions." (*Id.*)  Dr. Korgeski opined that Read's "situation would likely improve" if his life situation changed and he obtained adequate medical treatment for his impairments.  (*Id.*) It is unclear what particular type of medical treatment Dr. Korgeski believed would likely benefit Read and, assuming Read was not receiving that treatment, why he was not receiving it.

Instead of relying on Dr. Korgeski's speculative opinions regarding Read's mental limitations, the ALJ gave "great weight" to the opinions of non-examining agency psychiatric consultants Dr. William Farrell and Dr. Ellen Atkins.  (AR 31.)  Drs. Farrell and Atkins each considered Dr. Korgeski's opinions, and concluded that Read could sustain work consistent with the ALJ's RFC determination.  (*Compare* AR 27 *with* AR 489, 535.)  Read has not demonstrated that the ALJ erred in affording great weight to the opinions of Drs. Farrell and Atkins and only moderate weight to the opinions of Dr. Korgeski.  Although in many cases it is proper for the ALJ to afford reduced weight to the opinions of non-examining agency consultants like Drs. Farrell and Atkins, in favor

16

of the opinions of the examining medical providers, the regulations clearly permit the opinions of non-examining agency consultants to override those of examining sources, when, as here, the former are more consistent with the record evidence than the latter. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 567–68 (2d Cir. 1993)); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996).

For these reasons, the Court finds that the ALJ did not err in her analysis of the medical opinions.  Also noteworthy, although PT Lamb and Dr. Korgeski examined Read, it appears that no *treating* medical provider—i.e., a provider who saw and provided treatment for Read on an ongoing basis[4]—made any opinions on Read's limitations.

## IV.   Credibility Assessment

Next, Read challenges the ALJ's credibility assessment.  The ALJ found that, although Read's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of those symptoms "are not credible to the extent they are inconsistent with the [RFC] assessment."  (AR 28.)

It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant."  *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (quotation marks omitted).  If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.  *Id.* (citing

---

[4]   In *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988), the Second Circuit defined a "treating physician" as a physician "who has or had an *ongoing* treatment and physician-patient relationship with the individual."  (Emphasis added.)

*McLaughlin v. Sec'y of Health, Educ. and Welfare*, 612 F.2d 701, 704 (2d Cir. 1980)).

"When evaluating the credibility of an individual's statements, the adjudicator must

consider the entire case record and give specific reasons for the weight given to the

individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). Here, the

ALJ listed the appropriate credibility factors in her decision and considered several of

those factors in assessing Read's credibility, including the objective medical evidence,

Read's limited and conservative treatment regimen[5], Read's self-reported activities of

daily living[6], and Read's ability to sit and stand at the administrative hearing. (AR 27–

31.) As argued by the Commissioner, these are all appropriate factors for the ALJ to

consider. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p.

Read argues that the ALJ should not have made findings based on his appearance

at the administrative hearing, especially given that the hearing was conducted via video

teleconference and the ALJ "was not physically present in the room with Mr. Read."

(Doc. 16 at 2.) Regarding Read's appearance at the hearing, the ALJ stated: "During the

hearing, [Read] sat without showing overt signs of discomfort" and "stood without

difficulty in one quick, fluid movement from the chair." (AR 28.) There was no error, as

the Second Circuit has stated that an ALJ may consider her own recorded observation of

---

[5] Noting that Read was advised merely to take ibuprofen after presenting to the emergency room in March 2010 for neck, shoulder, and arm pain, the ALJ stated: "Were his pain perceived as more severe by treating physicians, he would have received a more intense medication regimen." (AR 29.) The ALJ also noted that Read was not using heat or ice for his shoulder pain, and that physical therapy notes "do not indicate that [Read] would be severely restricted in his lifting capabilities." (*Id.*)

[6] As noted by the ALJ, Read's Function Reports indicate that, during the alleged disability period, he was able to dress and bathe himself, prepare simple meals; and do some household chores including washing dishes and taking out the garbage on occasion. (AR 29–30 (citing AR 236–43, 253–60).)

the claimant at the hearing as part of her overall assessment of the claimant's credibility.

*See Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) (citing 20 C.F.R. § 416.929(c)(3);

SSR 96-97p).  The court explained:

> [W]e have not held that it is always error for an ALJ to take account of a claimant's physical demeanor in weighing the credibility of her testimony as to physical disability.  Although such observations should be assigned only "limited weight," there is no per se legal error where the ALJ considers physical demeanor as one of several factors in evaluating credibility.

*Id.*  The regulations also allow for such consideration, providing that "observations by

our employees and other persons" will be considered, in conjunction with all the other

relevant evidence, when determining the extent to which the claimant's symptoms limit

his or her capacity for work.  20 C.F.R. § 404.1529(c)(3).  Read has not shown that the

fact that the hearing was conducted via videotape affects the analysis.  Therefore, the

Court finds no error in the ALJ's consideration of Read's ability to remain seated and

stand without difficulty at the administrative hearing as one piece of evidence, among

others, demonstrating Read's physical abilities and limitations.

Moreover, in this case, the ALJ's observation regarding Read's ability to sit during

the hearing is consistent with other evidence in the record, namely Dr. Korgeski's

Psychological Evaluation which records that Read "did manage to sit for two hours

without having to get up [or] stretch" and "without [demonstrating] any overt pain

behavior . . . or clear-cut discomfort."  (AR 464.)  Read claims the ALJ should not have

considered Dr. Korgeski's observation regarding Read's ability to sit while ignoring Dr.

Korgeski's observation regarding Read's shoulder pain.  (Doc. 16 at 2–3.)  Read further

contends "there was no conflict in the medical evidence" regarding his shoulder pain, as

"[a]n MRI showed central disc herniation" and various providers diagnosed disc

degeneration, mechanical lower back pain, and impingement syndrome of both shoulders.

(*Id.* at 3.)  But none of these diagnoses indicate that Read's back and shoulder problems

were so severe that they were disabling; and the mere diagnosis of a condition "says

nothing about the severity of th[at] condition."  *Higgs v. Bowen*, 880 F.2d 860, 863 (6th

Cir. 1988).

Read further claims that the ALJ improperly "ignored" the treatment notes of

Nurse Maria Calderwood and Dr. Wayne Rinehart.  (Doc. 11 at 24.)  But in fact, the ALJ

specifically mentioned Dr. Rinehart's December 2010 treatment notes in her decision,

accurately stating: "When [Read] began treating with Dr. Rinehart for back pain, [he] . . .

ambulated with a normal gait; motor and sensory examinations of the upper and lower

extremities were normal[; and] [h]e had a negative straight leg raise."  (AR 28 (citing AR

555).)  Regarding the treatment notes of Nurse Calderwood, Read does not specify which

notes he claims the ALJ was required to discuss, and merely mentions in a footnote Nurse

Calderwood's treatment notes regarding Read's knee pain, which Read has not claimed

was a severe impairment or even a contributing cause of his disability.  (*See* Doc. 11 at

24, n.8; AR 218–19).)  The ALJ was therefore not required to discuss Nurse

Calderwood's treatment notes.[7]  *See Campbell v. Astrue*, 465 F. App'x 4, 6 (2d Cir. 2012)

(holding that the Second Circuit "'do[es] not require that [the ALJ] have mentioned every

---

[7]  Nurse Calderwood declined Read's counsel's request to provide a "functional work status evaluation or exam," stating that she "do[es] not do that kind of exam."  (AR 580.)

item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability'") (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

For these reasons, the ALJ did not err in her assessment of Read's credibility.

## V.      Consideration of Vocational Evidence

Finally, Read argues that the ALJ erred in failing to resolve a conflict between statements made by VE Maurice Demurrer, who testified at the administrative hearing, and VE Howard Steinberg, who provided responses to interrogatories submitted by the ALJ after the hearing.[8]  (*See* AR 64–75, 313–32.)  The argument fails for two principal reasons.  First, the ALJ clearly stated in her decision that she was not relying on VE Demurrer's testimony at the hearing because he was "[unable] to provide incidents of occupations in response to a hypothetical question," and instead was relying on VE Steinberg's responses to interrogatories submitted by her and reviewed by Read's counsel.  (AR 21; *see* AR 33, 328.)  Read's counsel was aware of and had no objection to this procedure as of the date of the hearing, and even assisted the ALJ in preparing the interrogatories to VE Steinberg.  (*See* AR 72–75.)  Second, both VEs agreed that Read retained the capacity to perform his past work as a fast-food worker (AR 70, 328–29), so there was no conflict for the ALJ to resolve.

Read further asserts that the ALJ should have included in her hypothetical to the VEs the limitation that the claimant had only "'one good arm'" because agency

_____

[8]  Although Read does not pursue this argument in his Reply (*see* Doc. 16), the Court addresses it here, in accordance with the general policy of liberally applying the Social Security Act in favor of the claimant.

consultants Drs. Stackpole and Knisely made that notation about Read in their reports. (Doc. 11 at 25 (citing AR 498, 513).)  But the ALJ did not include that limitation in her RFC determination (AR 27) and thus was not required to include it in her hypothetical to the VEs.  Moreover, it is not error for an ALJ to accept certain portions of a medical opinion while rejecting others.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

## Conclusion

In sum, there are no treating provider opinions to support Read's claim, and the ALJ did not err in giving limited weight to the examining consultant opinions because (a) the opinions of PT Lamb, who opined on Read's physical limitations, are vague and unsupported; (b) PT Lamb is not an acceptable medical source; and (c) the opinions of Dr. Korgeski, who opined on Read's mental limitations, are speculative and do not indicate what Read's abilities and limitations are.  Moreover, PT Lamb's opinions are basically accounted for in the ALJ's RFC determination.  Read's claim rests largely on his credibility regarding his level of pain, and, as discussed above, the Court finds no error in the ALJ's credibility assessment.  While Read clearly reported pain to his medical providers and to the ALJ at the administrative hearing, "disability requires more than mere inability to work without pain.  To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment."  *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983); *see Prince v. Astrue*, 490 F. App'x 399, 400 (2d Cir. 2013).

For these reasons, the Court DENIES Read's motion (Doc. 11), GRANTS the Commissioner's motion (Doc. 15), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 12th day of March, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge